**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA**

**CHARLESTON DIVISION**

-------------------------------------------------------------------X

ALEIDA GONZALEZ,

                                        *Plaintiff,*

                        -against-

3M COMPANY, f/k/a Minnesota Mining and
Manufacturing Company, AGC CHEMICALS AMERICAS
INC., ARKEMA INC., BASF CORPORATION,
BUCKEYE FIRE EQUIPMENT COMPANY, CARRIER
GLOBAL        CORPORATION,        CHEMDESIGN
PRODUCTS, INC, CHEMGUARD, INC., CLARIANT
CORPORATION, CORTEVA, INC., DUPONT DE
NEMOURS INC., f/k/a DOWDUPONT, INC., DYNAX
CORPORATION, E.I. DUPONT DE NEMOURS AND
COMPANY, individually and as successor in interest to
DuPont Chemical Solutions Enterprise, , KIDDE-
FENWAL, INC., NATIONAL FOAM, INC., THE
CHEMOURS COMPANY, individually and as successor in
interest to DuPont Chemical Solutions Enterprise, THE
CHEMOURS COMPANY FC, LLC, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise, TYCO FIRE PRODUCTS L.P., and UTC FIRE
& SECURITY AMERICAS CORPORATION, INC.,

                                        *Defendants.*

-------------------------------------------------------------------X

Civil Action No: 2:22-cv-03640-RMG

Master Docket No.: 2:18-mn-2873

**JUDGE RICHARD GERGEL**

**DIRECT FILED
COMPLAINT AND JURY
DEMAND PURSUANT TO
CMO #3**

1

## COMPLAINT

Plaintiff, Aleida Gonzalez ("Plaintiff"), by and through her attorneys, Douglas & London, P.C., for this Complaint against: 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Company, BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., TYCO FIRE PRODUCTS L.P., NATIONAL FOAM, INC., E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise, CORTEVA, INC., DUPONT DE NEMOURS INC., f/k/a DOWDUPONT, INC., ARKEMA INC., AGC CHEMICALS AMERICAS INC., DYNAX CORPORATION, KIDDE-FENWAL, INC., CLARIANT CORPORATION, BASF CORPORATION, and CHEMDESIGN PRODUCTS, INC. (collectively "Defendants") allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.      This is a civil action for compensatory and punitive damages, costs incurred by Plaintiff, and any other damages that the Court or jury may deem appropriate for the pain and suffering arising from the intentional, malicious, knowing, reckless and/or negligent acts and/or omissions of Defendants in connection with Aqueous Film-Forming Foam ("AFFF") containing Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic acid ("PFOS") and/or the Plaintiff. All Defendants were involved in the manufacturing of the fluorochemical products, the AFFF and/or the precursors to PFOA and PFOS (collectively hereinafter "fluorochemical products" or "C8") to which Plaintiff was exposed.

## JURISDICTION AND VENUE

2

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between Plaintiff and defendants and the amount in controversy exceeds $75,000.00.

3.     Plaintiff is filing this Complaint as permitted by Case Management Order No. 3 ("CMO #3") issued by Judge Richard M. Gergel of this Court. Pursuant to CMO #3, Plaintiff designates the United States District Court for the Western District of Texas as the "home venue" where Plaintiff would have otherwise filed suit pursuant to 28 U.S.C. § 1391. But for CMO #3, venue is proper in the United States District Court for the Western District of Texas in that the events or omissions giving rise to the claim occurred in that district. Plaintiff respectfully request that, at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the United States District Court for the Western District of Texas.

4.     The United States District Court for the Western District of Texas has personal jurisdiction over the Defendants because at all times relevant to this lawsuit, the Defendants manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFAS-containing AFFF products to various locations, such that each Defendant knew or should have known that said products would be delivered to areas in the state of Texas for active use by Plaintiff during the course of training and firefighting activities. Therefore, the exercise of jurisdiction over the Defendants by the United States District Court for the Western District of Texas of does not offend traditional notions of fair play and substantial justice.

## PARTIES
### PLAINTIFF

3

5.     Plaintiff Aleida Gonzalez is a citizen of the United States of America, and a current resident of Rio Grande City, Texas.

6.     Plaintiff Aleida Gonzalez is the daughter of Noel Gonzalez (the "Decedent")

7.     The Decedent, Noel Gonzalez, was born on January 13, 1961, and died on March 8, 2019.

8.     Prior to his death, Decedent was a resident of Rio Grande City, Texas.

9.     Decedent was exposed to Defendants' AFFF and its fluorochemical products throughout his career as a firefighter with the Starr County Fire Department, located in Rio Grande City, Texas.

10.    As a result of his exposure to Defendants' fluorochemical products, Decedent was diagnosed with liver cancer and pancreatic cancer, which caused Decedent to suffer severe personal injuries, pain, and emotional distress.

11.    The Decedent's injuries, pain, suffering, and emotional distress were caused by Defendants' fluorochemical products.

**DEFENDANTS**

12.    The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

13.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

14.    When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives

of the defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of defendants, and did so while acting within the scope of their duties, employment or agency.

15.     At all times relevant to this litigation, upon information and belief, each of the defendants designed, developed, manufactured, marketed and/or sold the AFFF or fluorochemical products containing PFOA or PFOS used by firefighters throughout the country, including in Texas.

16.     Each of the Defendants designed, developed, manufactured, marketed and/or sold the AFFF or fluorochemical products containing PFOA or PFOS to which Decedent was exposed and directly and proximately caused Decedent to develop liver and pancreatic cancers, and to suffer severe personal injuries, pain, suffering, and emotional distress.

17.     **Defendant 3M Company (f/k/a/ Minnesota Mining and Manufacturing Company) ("3M")** is a Delaware Corporation and conducts business throughout the United States, with its principal place of business located at 3M Center, St. Paul Minnesota 55144.

18.     3M Company manufactured, distributed, and sold fluorochemical products and AFFF from the 1960s until 2002.

19.     **Buckeye Fire Equipment Company ("Buckeye")** is a corporation organized and existing under the laws of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

20.     **Chemguard, Inc.** is a corporation organized and existing under the laws of Texas, with its principal place of business at one Stanton Street, Marinette, Wisconsin 54143.

21.     Upon information and belief, Chemguard is a subsidiary of Johnson Controls International PLC.

22.     **Tyco Fire Products L.P. ("Tyco")** is a limited partnership organized under the laws of Pennsylvania, with its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

23.     Upon information and belief, Tyco is a subsidiary of Johnson Controls International PLC.

24.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

25.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFOA and PFOA. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFOA and PFOS.

26.     Upon information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard AFFF products through its Chemguard Specialty Chemicals division.

27.     **National Foam, Inc.** ("National Foam") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501 and at 350 East Union Street, West Chester, Pennsylvania 19382.

28.     Upon information and belief, National Foam is a subsidiary of Angus International Safety Group, Ltd.

29.     **E. I. DuPont de Nemours & Company ("DuPont")** is a corporation organized and existing under the laws of Delaware, having a principal place of business is 974 Centre Road Wilmington, Delaware 19805.

30.     DuPont is a successor in interest to **DuPont Chemical Solutions Enterprise** ("DuPont Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

31.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

32.     In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzeniowski, DuPont provided its Telomer-based sales products in the United States for the year 2002.

33.     The letter, which was redacted and sent to the USEPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.

34.     **The Chemours Company ("Chemours")** is a corporation organized and existing under the laws of Delaware, having a principle place of business at 1007 Market Street, Wilmington, Delaware 19889.

35.     In 2015, DuPont spun off its "performance chemicals" business to Chemours along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its performance chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorochemicals and the products that contain fluorochemicals.

36.    **The Chemours Company FC LLC ("Chemours FC")**, a successor in interest to DuPont Chemical, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street Wilmington, Delaware 19899.

37.    **Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

38.    **Dupont de Nemours Inc. f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

39.    On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off Corteva.

40.    Prior to the separation, DowDuPont owned Corteva as a wholly-owned subsidiary formed in February 2018.

41.    On June 1, 2019, DowDuPont distributed a pro rata dividend of both issued and outstanding shares of Corteva common stock to DowDuPont shareholders.

42.    Corteva holds certain Dow DuPont assets and liabilities including DowDuPont's agriculture and nutritional businesses.

43.    On June 1, 2019 DowDuPont, the surviving entity after the spin-off of Corteva and another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva.

44.     Defendants E.I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

45.     **Arkema Inc. ("Arkema")** is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

46.     Arkema develops specialty chemicals and fluoropolymers.

47.     Arkema is a successor in interest to Elf Atochem North America and Atofina Chemicals Inc., which manufactured fluorosurfactants containing PFOA that was used in AFFF.

48.     **AGC Chemicals Americas Inc**. **("AGC Americas")** is a corporation organized and existing under the laws of Delaware, having a principal place of business in 5 East Uwchlan Avenue, Suite 201 Exton, PA 19341 United States.

49.     AGC Americas operates throughout the United States, manufacturing glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates, including those used in AFFF products.

50.     **Dynax Corporation ("Dynax")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544.

51.     On information and belief, Dynax entered the AFFF business in 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

52.    **Kidde-Fenwal, Inc.** ("Kidde-Fenwal") is a corporation organized under the laws of Delaware, having a principal place of business at One Financial Plaza, Hartford, Connecticut 06101. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").

53.    **Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

54.    On information and belief, Clariant was formerly known as Sandoz Chemicals Corporation, and manufactured fluorointermediates used in AFFF products.

55.    **BASF Corporation, ("BASF")**, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

56.    On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

57.    On information and belief, BASF Corporation is the successor in interest to Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc., a Swiss specialty chemicals company, that manufactured fluorosurfactants containing PFOA used in AFFF.

58.    **ChemDesign Products, Inc.** is a corporation organized and existing under the laws of Texas and having a principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143, that manufactured fluorosurfactants containing PFOA used in AFFF.

## FACTUAL ALLEGATIONS

## THE FLUOROCHEMICALS: PFOA AND PFOS

59.     Fluorochemical products are man-made chemicals composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. Fluorochemical products that contain eight carbon-fluorine bonds such as PFOA and PFOS are sometimes referred to as "C8."

60.     PFOA and PFOS are highly water soluble, which facilitates the ease at which they spread throughout the environment, contaminating soil, groundwater, and surface water. This mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.

61.     PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.

62.     PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.

63.     Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

64.     According to the United States Environmental Protection Agency ("EPA"), studies indicate that exposure to PFOA and PFOS over certain levels may result in developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations), cancer (e.g., testicular, kidney), liver effects (e.g., tissue damage),

immune effects (e.g., antibody production and immunity), thyroid effects and other effects (e.g., cholesterol changes).

65.     The EPA has also warned that there is suggestive evidence of carcinogenic potential for PFOA and PFOS.

66.     The EPA has noted that drinking water can be an additional source of PFC's in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, such contamination is typically localized and associated with a specific facility, for example…an airfield at which fluorochemical products were used for firefighting."

67.     The EPA has issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water. When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

## AQUEOUS FILM-FORMING FOAM

68.     AFFF is a type of water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports and military bases, among other places.

69.     The AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained either or both PFOA and PFOS, or the chemical precursors to PFOA or PFOS.

70.     PFOS and/or the chemical precursors to PFOS contained in 3M's AFFF were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

71.    All other Defendants manufactured fluorosurfactants for use in AFFF through the process of telomerization. Telomerization produced fluorotelomers, including PFOA and/or the chemical precursors to PFOA.

72.    AFFF can be made without PFOA, PFOS, or their precursor chemicals, that do not release PFOA, PFOS, and/or their precursor chemicals into the environment or in humans .

73.    When used as the Defendants intended and directed, Defendants' AFFF releases PFOA, PFOS, and/or their precursor chemicals into the environment.

74.    Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions and are extremely persistent in the environment. Because of their persistence, they are widely distributed throughout soil, air, and groundwater.

75.    Due to the chemicals' persistent nature, among other things, these chemicals continued to cause injury and damage to Decedent.

### DEFENDANTS' KNOWLEDGE

76.    On information and belief, by the early 1980s, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed in the open environment per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

77.    Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe

damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens which cause genetic damage.

78.    In 1980, 3M published data in peer- reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.

79.    By the early 1980s, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

80.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.

81.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."

82.    Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.

83.    From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed, and sold fluorochemical products, including Teflon nonstick

cookware, and more recently, PFAS feedstocks, such as Forafac 1157 N, for the use in the manufacture of AFFF products.

84.    Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, and sold fluorochemical products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products.

85.    Based on information and belief, in 2001 or earlier, DuPont manufactured, produced, marketed, distributed, and sold fluorochemical products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products.

86.    DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River, and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, and/or the environment.

87.    By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History." The EPA fined DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."

88.    By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from its Washington Works plant reviewed the available scientific evidence and concluded that a "probable link" exists between PFOA exposure and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and

preeclampsia. By October 2012, the C8 Science Panel concluded that a probable link also exists between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

89.    In July 2015, DuPont spun off its chemicals division by creating Chemours as a new publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

90.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, distributed, and/or sold AFFF products containing fluorochemicals, and/or fluorochemical products for use in AFFF; (2) failed to issue instructions on how AFFF containing fluorochemical products should be used and disposed of; (3) failed to recall and/or warn the users of fluorochemical products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of surface water, soil, and groundwater contamination as a result of standard use and disposal of these products; and (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of fluorochemical products, notwithstanding the fact that Defendants knew foreseeable the identities of the purchasers and end-users of the fluorochemical products, as well as the final fate of fluorochemical products in water and biota, including in humans.

## NOEL GONZALEZ'S EXPOSURE TO AFFF

91.    Upon information and belief, the Starr County Fire Department has stored and used Defendants' AFFF containing PFOA or PFOS chemicals and/or their precursor chemicals in firefighter training and response exercises.

16

92.     Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF containing PFOA or PFOS chemicals and/or their precursor chemicals to the Starr County Fire Department, for use throughout training and operations.

93.     The descriptive labels and material safety data sheets for Defendants' AFFF containing PFOA or PFOS and/or their precursor chemicals utilized by firefighters with the Starr County Fire Department did not reasonably or adequately describe the risks of AFFF products to human health.

94.     The Defendants knew or should have known of the hazards of AFFF containing PFOA or PFOS and/or their precursor chemicals when the products were manufactured.

95.     From around 1985 to 2003, Decedent was employed as a firefighter with the Starr County Fire Department.

96.     Decedent was exposed to and ingested Defendants' AFFF and fluorochemical products throughout the duration of his service with the Starr County Fire Department.

97.     During Decedent's exposure to Defendants' AFFF products containing PFOA and/or PFOS and/or their precursor chemicals, Plaintiff ingested such products, and the PFOA and/or PFOS and/or their precursor chemicals entered Decedent's body.

98.     At no point during his trainings or career did Decedent receive any warning that Defendants' AFFF products containing PFOA and/or PFOS and/or their precursor chemicals were toxic or carcinogenic.

99.     In or around 2013, Decedent's doctors diagnosed Decedent with liver and pancreatic cancers

17

100.    On October 20, 2020, Plaintiff discovered that Decedent's liver and pancreatic cancers were caused by exposure to Defendants' AFFF products containing PFOA and/or PFOS.

## AS AND FOR A FIRST CAUSE OF ACTION
## PRODUCTS LIABILITY – DEFECTIVE DESIGN – CONSUMER EXPECTATIONS

101.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

102.    At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling, of fluorochemical products.

103.    At all times pertinent to this Complaint, Defendants regularly participated in placing the fluorochemical products into the American stream of commerce.

104.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and/or marketers of fluorochemical products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Decedent, not to manufacture, sell, and/or market any product which is unreasonably dangerous for its intended and foreseeable uses.

105.    Decedent used Defendants' fluorochemical products in a reasonably foreseeable manner and without substantial changes in the condition in which the products were sold.

106.    Defendants' fluorochemical products used by Decedent did not perform as safely as an ordinary consumer would have expected the products to perform when used as Decedent did in an intended or reasonably foreseeable manner because PFOA and PFOS are carcinogens and otherwise harmful to human health.

18

107.    Defendants' defective design of the fluorochemical products was far more dangerous than Decedent or an ordinary consumer would expect when used, as Decedent did, in an intended and reasonably foreseeable manner.

108.    Defendants' fluorochemical products failure to perform safely was a substantial factor in causing Decedent's harm.

109.    Defendants could have manufactured, marketed, and sold alternative designs or formulations of products that did not contain harmful fluorochemicals.

110.    These alternative designs and/or formulations were available, practical, and technologically feasible.

111.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to human health that was caused by Defendants' manufacture, marketing, and/or sale of fluorochemical products.

112.    The risks of fluorochemical products were not obvious to users of the AFFF, nor were they obvious to users in the vicinity of the AFFF use, including Decedent, who were unwittingly exposed to Defendants' toxic and carcinogenic chemicals. Decedent could not have reasonably discovered the defects and risks associated with the use of fluorochemical products and could not protect themselves from exposure to Defendants' fluorochemical products.

113.    As a direct and proximate result of Defendants' defective design, Decedent suffered some or all of the following damages:

a.    Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

b.    Physical injury, both temporary and permanent;

c.    Economic Damages;

d.    Severe and significant emotional distress and mental pain and suffering;

e.   Humiliation, embarrassment and fear;

f.   Loss of enjoyment of life;

g.   Annoyance and inconvenience; and

h.   Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

114.   As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff.

115.   Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Decedent.

## AS AND FOR A SECOND CAUSE OF ACTION

### PRODUCTS LIABILITY – DEFECTIVE DESIGN – RISK-UTILITY

116.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

117.   At all times relevant to the Complaint, Defendants were regularly engaged in the design, formulation, production, creation, making, construction, assembly, rebuilding, sale, distribution, preparation, and labeling, of fluorochemical products.

118.   At all times pertinent to this Complaint, Defendants regularly participated in placing the fluorochemical products into the American stream of commerce.

119.   As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of fluorochemical products, Defendants owed a duty to all persons whom Defendants' products might foreseeably harm, including Decedent and Plaintiff, not to

manufacture, sell, or market any product which is unreasonably dangerous for its intended and foreseeable uses.

120.    Defendants' fluorochemical products were defectively designed and manufactured when the products left the hands of Defendants, such that the foreseeable risks associated with the use, storage, and disposal of the fluorochemical products exceeded the alleged benefits associated with its design and formulation.

121.    At all times relevant to this litigation, Defendants' fluorochemical products reached Defendants' intended consumers and users without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

122.    Defendants could have manufactured, marketed, and sold alternative designs or formulations of products that did not contain harmful fluorochemicals.

123.    These alternative designs and/or formulations were available, practical, and technologically feasible.

124.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to human health that was caused by the Defendants' manufacture, marketing, and sale of fluorochemical products.

125.    The fluorochemical products manufactured, sold, or distributed by the Defendants were defective in design because the foreseeable risk of harm posed by the fluorochemical products could have been reduced or eliminated by the adoption of a reasonable alternative design.

126.    As a direct and proximate result of Defendants' defective design, Decedent suffered some or all of the following damages:

a.    Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

b.  Physical injury, both temporary and permanent;

c.  Economic Damages;

d.  Severe and significant emotional distress and mental pain and suffering;

e.  Humiliation, embarrassment and fear;

f.  Loss of enjoyment of life;

g.  Annoyance and inconvenience; and

h.  Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

127.    As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff.

128.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Decedent.

## AS AND FOR A THIRD CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – FAILURE TO WARN

129.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

130.    Defendants knew or should have known that exposure to fluorochemical products presented a substantial danger when used because it is hazardous to human health and the environment.

131.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling fluorochemical products would result in physical harm to Decedent.

132.    Ordinary consumers of Defendants' fluorochemical products would not have recognized the risks.

133.    Defendants failed to adequately warn Decedent of the potential risks of fluorochemical products.

134.    Adequate instructions and warnings on the fluorochemical products could have reduced or avoided these foreseeable risks of harm to Decedent's health.

135.    Had Defendants provided adequate warnings, Decedent could have taken measures to avoid or lessen the exposure.

136.    The lack of sufficient warnings was a substantial factor in causing Decedent's harm.

137.    Defendants' failure to warn was a direct and proximate cause of Decedent's liver and pancreatic cancers.

138.    Defendants' failure to provide adequate and sufficient warnings for the fluorochemical products that they manufactured, marketed, and sold renders the fluorochemical products defective products.

139.    As a direct and proximate result of Defendants' defective design, Decedent suffered some or all of the following damages:

a.    Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

b.    Physical injury, both temporary and permanent;

c.    Economic Damages;

d.    Severe and significant emotional distress and mental pain and suffering;

e.    Humiliation, embarrassment and fear;

f.    Loss of enjoyment of life;

g.    Annoyance and inconvenience; and

h.    Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

140.    As a result of Defendants' manufacture, sale, and/or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff.

141.    Defendants' acts were willful, wanton, reckless, and/or conducted with a reckless indifference to the rights of Decedent.

## AS AND FOR A FOURTH CAUSE OF ACTION
### NEGLIGENCE

142.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint as if restated in full therein.

143.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, or handlers of fluorochemical products, Defendants owed a duty to Decedent to exercise reasonable care in the instructing, labeling, and warning of the handling, control, use and disposal of Defendants' fluorochemical products.

144.    Defendants also voluntarily assumed a duty towards Decedent by affirmatively representing to Decedent that Defendants' previously detailed acts and/or omissions were not causing any physical harm or other damage to him, and that Defendants' fluorochemical products were safe to use.

145.    Defendants' fluorochemical products are inherently dangerous substances and Defendants' owed a duty of care towards the Decedent that was commensurate with the

harmful nature of the fluorochemical products and the dangers involved with exposure to fluorochemical products.

146.    Defendants failed to correct, clarify, rescind, and/or qualify its representations to Decedent that Defendants' acts and/or omissions were not causing any physical harm and/or damage to him, or that the fluorochemical products were safe to use.

147.    Despite knowing that their fluorochemical products are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants failed to use reasonable care when they: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold fluorochemical products; (b) issued instructions on how fluorochemical products should be used and disposed of; (c) failed to recall and/or warn the users of fluorochemical products of the dangers to human health and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings and/or recalls to the users of fluorochemical products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their fluorochemical products.

148.    But for Defendants' negligent acts and/or omissions, Decedent would not have been exposed to unhealthy levels of fluorochemicals.

149.    Defendants' failure to act with reasonable care to (1) design a product to perform safely; (2) failure to issue an adequate warning or instruction on the use of fluorochemical products warning and; (3) failure to issue a recall, were substantial factors in causing Decedent f's harm.

150.    Defendants knew or reasonably should have known that users would not realize the danger Defendant's fluorochemical products posed to human health.

151.    A reasonable manufacturer or distributor under the same or similar circumstances would have warned of the danger.

152.    Defendants' negligent acts and omissions directly and proximately caused Decedent's liver and pancreatic cancers, as well as severe personal injuries, pain, suffering, and emotional distress.

153.    It has been reasonably foreseeable to Defendants for at least several decades that Defendants' negligent acts and/or omissions would directly and proximately cause bodily injury and economic damage to Decedent including the injuries and damages that Decedent suffered.

154.    Defendants' were conscious of the dangers of fluorochemical products, and its negligent acts or omissions, and were conscious that bodily injury to Decedent would or was likely to result from the fluorochemical products and Defendants' negligent acts and/or omissions. Nevertheless, with reckless indifference to these consequences, and as previously detailed, Defendants consciously and intentionally acted negligently and/or omitted the duties Defendants knew it owed to Decedent, other exposed individuals, and the public at large, and Decedent was harmed as a result.

155.    The acts and omissions of Defendants were negligent, intentional, reckless, malicious, willful and/or wanton, and as a direct and proximate result Decedent, has suffered and some or all of the following damages:

     a.    Medical and hospital bills for diagnosis, monitoring, and treatment of injuries;

26

b.  Physical injury, both temporary and permanent;

c.  Economic Damages;

d.  Severe and significant emotional distress and mental pain and suffering;

e.  Humiliation, embarrassment and fear;

f.  Loss of enjoyment of life;

g.  Annoyance and inconvenience; and

h.  Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys' fees and costs associated with the prosecution of this action.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**CONCEALMENT MISREPRESENTATION AND FRAUD**

156.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

157.    Defendants knowingly, intentionally, maliciously, willfully, wantonly, recklessly and/or negligently failed and/or refused to advise Decedent of the dangers and/or health risks posed by Defendants' fluorochemical products.

158.    Defendants negligently, knowingly, maliciously, willfully, wantonly, recklessly, intentionally, and/or negligently withheld, misrepresented, and/or concealed information regarding Defendants' fluorochemical products from Decedent who had a right to know of information which would have prevented Decedent from being exposed and/or continuing to be exposed to the fluorochemical products.

159.    For at least several decades, Defendants had knowledge or the means of knowledge that Defendants' fluorochemical products were causally connected with or could

27

increase the risk of causing damage to humans and animals, including knowledge of statistically significant findings showing a causal connection between exposure to fluorochemical products and physical injuries in humans and animals.

160.    In connection with the fluorochemical products, Defendants had a general duty of care to disclose to Decedent the actual and potential harm to his person as a direct and proximate result of Defendants' acts and/or omissions, including a general duty of care to disclose to Decedent that Defendants had, and were continuingly, exposing Decedent to harmful levels of fluorochemicals.

161.    In addition to its general duty of care, Defendants also voluntarily assumed a duty to disclose to Decedent the actual and potential harm to his body as a direct and proximate result of Defendants' acts and/or omissions, including a duty to disclose to Decedent that Defendants had exposed, and were continuingly exposing Decedent to harmful fluorochemical products, which duty was voluntarily assumed by affirmatively representing to Decedent that the Defendants and their fluorochemical exposure were harmless, when Defendants knew and/or reasonably should have known that the Defendants' fluorochemical products caused, and were continuing to cause, bodily injury.

162.    Through Defendants' superior knowledge, responsibility, and/or control over the fluorochemical products, and Defendants' voluntary actions and/or representations, a relationship of trust and confidence existed between Defendants and Decedent.

163.    Despite Defendants' knowledge regarding fluorochemical exposure, and despite Defendants' duties to disclose to Decedent, Defendants negligently, maliciously, knowingly, willfully, wantonly, recklessly and/or intentionally withheld, misrepresented, and/or concealed information from Decedent regarding exposure to fluorochemical products.

164.    Defendants withheld, misrepresented, and/or concealed information regarding fluorochemical exposure from Decedent with the intention to mislead and/or defraud him into believing that their fluorochemical exposure was not harmful, and to mislead and/or defraud him into continuing to use the fluorochemical products.

165.    Defendants withheld, misrepresented, and/or concealed information regarding fluorochemical exposure that was a substantial factor in causing Decedent's harm.

166.    As a direct and proximate result of the aforesaid acts and/or omissions by Defendants, acting for and on its own behalf and as agent, ostensible agent, employee, conspirator and/or joint venture of others, Decedent was exposed to Defendants' fluorochemical products and was injured.

167.    Defendants not only withheld, misrepresented, and/or concealed material information from Decedent but also committed fraud against Decedent by affirmatively representing to Decedent that their fluorochemical products were harmless and/or did not present any risk of harm, when Defendants knew, reasonably should have known, and/or with utter disregard and recklessness as to whether it was true or not, that Defendants' fluorochemical products had caused, and were continuing to cause, bodily injury and/or risk of such bodily injury to Decedent.

168.    Defendants' representations to Decedent were knowingly, intentionally, negligently, and/or recklessly false.

169.    Defendants had a duty of care to provide Decedent, with truthful representations regarding the actual and potential harm to his person as a direct and proximate result of Defendants' acts and/or omissions, and Defendants voluntarily assumed a duty of care to provide Decedent with truthful representations regarding Defendants' fluorochemical products

and the actual and potential harm to his persons as a direct and proximate result of Defendants' acts and/or omissions.

170.    Defendants' affirmative representations and/or omissions to Decedent were false and were material to Decedent in forming his belief that Defendants' fluorochemical products were safe, in causing him to continue to use the fluorochemical products, and in causing him to not seek treatment and/or ways to remedy his past and continuing exposure to fluorochemical products.

171.    Defendants made the affirmative representations and/or omissions to Decedent with the intention that Decedent would be misled into relying on such affirmative representations and/or omissions.

172.    Decedent relied on Defendants' affirmative representations and/or omissions in forming his belief that Defendants' fluorochemical products were safe in causing him to continue to use the fluorochemical products, and in not seeking treatment and/or ways to remedy his past and continuing exposure to Defendants' fluorochemical products.

173.    Decedent was damaged, physically harmed, and died as a direct and proximate result of his justified reliance on Defendants' affirmative, fraudulent representations and/or omissions and, as a direct and proximate result of such justified reliance, Decedent continued to use the fluorochemical products.

## AS AND FOR A SIXTH CAUSE OF ACTION
### NEGLIGENCE PER SE

174.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

175.     One or more federal statutes, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 6921-6939e, impose duties of care on Defendants with regard to Defendants' actions and/or omissions towards Decedent and/or Decedent's safety.

176.     By Defendants' acts and/or omissions resulting in harm to Decedent, Defendants' violated and/or continue to violate and/or breach one or more federal statutes and/or duties, including but not limited to 15 U.S.C. §§ 2607 and 2614, 33 U.S.C. §§ 1311(a) and 1342, and 42 U.S.C. §§ 6921-6939e, constituting negligence per se, including liability for all injuries to Decedent associated with the fluorochemical products.

177.     Defendants' violation of law and breach of its statutory duties directly and proximately caused and continue to directly and proximately cause damage to Decedent in the form of economic damage and bodily injury for which Defendants are liable.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### PAST AND CONTINUING TRESSPASS AND BATTERY

178.     Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action.

179.     Defendants have known for several decades that their fluorochemical products are harmful and toxic to humans and animals, and once ingested, will remain in a person's body for a long time, including through binding to blood and/or tissues.

180.     Despite such knowledge, Defendants continued to use the fluorochemical products, which caused harmful physical contact with Decedent.

181.    Defendants' continued actions with knowledge that such actions will result in harmful physical contact with Decedent demonstrate intent and/or reckless indifference by Defendants without regard to the harm they have caused and will cause.

182.    Defendants' intentional acts and/or omissions have resulted in fluorochemicals, in the body of Decedent or otherwise unlawful and harmful invasion, contact, and/or presence of fluorochemicals in Decedent's body, which interfered with Decedent's rightful use and possession of Decedent's body.

183.    The fluorochemicals present in and/or on Decedent's body originating from Defendants' fluorochemical products was at all relevant times hereto, and continues to be, the property of Defendants.

184.    The invasion and presence of the fluorochemical products in and/or on Decedent's body was and continues to be unconsented and without permission or authority from Decedent or anyone who could grant such permission or authority.

185.    Defendants' intentional acts and/or omissions were done with the knowledge and/or belief that the invasion, contact, and/or presence of fluorochemical products onto, and/or into Decedent's body were substantially certain to result from those acts and/or omissions.

186.    Harmful contact with Decedent's body was the direct and/or indirect result of Defendant's intentional acts and/or omissions.

187.    The presence and continuing presence of the fluorochemical products in and/or on Decedent's body is offensive, unreasonable, and/or harmful and constitutes a continuing and/or permanent trespass and battery.

188.    Defendants' past and continuing trespass and battery upon Decedent's body directly and proximately caused damage to Decedent in the form of bodily injury, and emotional distress, for which Defendants' are liable.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## NEGLIGENT, INTENTIONAL, AND RECKLESS INFLICTION OF EMOTIONAL DISTRESS

189.    Plaintiff incorporates herein by reference each and every paragraph of this Complaint as though set forth in full in this cause of action

190.    Defendants' acts and/or omissions were negligent, intentional, and/or reckless, including Defendants' continued pollution of the environment and resultant exposure of Decedent to harmful fluorochemical products, despite knowing for decades that such exposure was causing and would continue to cause harm and/or unacceptable risk of harm to Decedent.

191.    Defendants' negligently, knowingly and/or intentionally withheld and concealed material information from and/or affirmatively misrepresented to Decedent that they were not exposed to harmful fluorochemical products and/or that the fluorochemical products were not causing or creating any risk of harm to them, despite knowing at the time these concealments and/or misrepresentations were made that the fluorochemical products were causing and would continue to cause harm and/or unacceptable risk of harm to persons, including Decedent.

192.    At the time of Defendants' negligent, knowing, and/or intentional acts and/or omissions, it was foreseeable to Defendants and Defendants were certain and/or substantially certain that its actions and/or omissions would cause emotional distress to Decedent.

193.    Defendants' acts and/or omissions were extreme, outrageous, intolerable, and/or offended the generally accepted standards of decency and morality.

33

194.    By continuing to expose Decedent to harmful fluorochemical products, and continuing to misrepresent to Decedent that the fluorochemical products were not and would not cause them harm or risk of harm and/or continuing to withhold and/or conceal from Decedent material information on such issues, despite knowing that the fluorochemical products were causing and would continue to cause harm and/or risk of harm, Defendants acted in an extreme, outrageous, and intolerable manner which offended any generally accepted standard of decency and morality.

195.    Defendants' acts and/or omissions resulting in Defendants' concealment and/or misrepresentations, directly and proximately caused physical harm, and continue to cause physical harm, to Decedent.

196.    Defendants' acts and/or omissions resulting in Defendants' concealment and/or misrepresentations, directly and proximately caused great emotional suffering and distress, to Decedent.

197.    Defendants' extreme, outrageous and intolerable actions were a substantial factor in causing Decedent to suffer severe physical, mental, and emotional distress.

198.    As a direct and proximate result of Defendants' extreme, outrageous and intolerable actions, Decedent suffered severe physical, mental, and emotional distress.

199.    No reasonable person could be expected to endure the mental anguish caused by the knowledge that entities have negligently, knowingly, and/or intentionally exposed them to years of harmful contact with AFFF containing PFOA or PFOS and/or their precursor chemicals, and has furthermore actively misrepresented and/or concealed such danger from them, while reaping hundreds of millions of dollars in profits as a direct and proximate result.

## CLAIM FOR PUNITIVE DAMAGES

34

200.     Plaintiff hereby repeats, realleges, and reiterates each and every allegation in the preceding paragraphs as if fully restated herein.

201.     At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the fluorochemical products that were used by Decedent and that resulted in the physical bodily injuries that Decedent suffered.

202.     At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that their fluorochemical products were toxic chemicals capable of causing harm to human health.

203.     Defendants' negligent, reckless, willful, fraudulent, and/or wanton actions and/or intentional failures to act caused Decedent to be exposed to fluorochemical products.

204.     The willful, wanton, malicious, fraudulent and/or reckless conduct of Defendants, includes, but is not limited to:

a. issuing no warnings and failing to divulge material information concerning the release of fluorochemicals, including but not limited to PFOA and PFOS;

b. failing to take all reasonable measures to ensure fluorochemical products would be used effectively and properly disposed of;

c. failing to prevent the foreseeable impacts of fluorochemical exposure upon the Decedent.

d. withholding, misrepresenting, and/or concealing information regarding the releases of fluorochemical products and exposure from Plaintiff, other exposed individuals, and the public at large with the intention to mislead and/or defraud them into believing that

35

their exposure to fluorochemical products was not harmful, and to mislead and/or defraud them into continuing to purchase and consume drinking water contaminated with fluorochemical products.

205.    As a result of Defendants' conduct, Decedent was forced to incur, and Plaintiff has been forced to incur and will continue to incur significant costs related to the harm caused by Defendants' fluorochemical products, including serious, debilitating, and severe physical, mental, and emotional distress, all caused by Defendants' fluorochemical products.

206.    Defendants have demonstrated an outrageous conscious disregard for the physical safety of Decedent and acted with implied malice, warranting the imposition of punitive damages.

207.    Upon information and belief, Defendants' conduct involved wanton, willful, and/or a conscious and reckless disregard for the health, safety, property, and rights of others. The Court should award the Plaintiff punitive damages in an amount sufficient to deter and punish such conduct.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff demands judgment against Defendants, and each of them, jointly and severally, and requests the following relief from the Court:

A. Compensatory damages that exceed the jurisdictional limit of this court;

B. Punitive damages that exceed the jurisdictional limit of this court;

C. Reasonable fees for attorneys and expert witnesses;

D. Costs and disbursements of this lawsuit;

E. Interest on the damages according to law; and

F. Any other and further relief as the Court deems just, proper and equitable.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated: October 20, 2022                    Respectfully submitted,

**Douglas & London PC**

By: <u>s/ Michael A London</u>
Michael A. London, Esq.
59 Maiden Lane, 6th Fl.
New York, NY 10038
(212) 566-7500
mlondon@douglasandlondon.com

Tate J. Kunkle, Esq.
59 Maiden Lane, 6th Fl.
New York, NY 10038
(212) 566-7500
tkunkle@douglasandlondon.com